Grafton
No. 99-565

NEW CANAAN BANK & TRUST

v.

STEVEN S. PFEFFER

November 1, 2001

122

*Clauson & Atwood,* of Hanover (*K. William Clauson* on the brief and orally), for the plaintiff.

*DesMeules, Olmstead & Ostler,* of Norwich, Vermont (*Frank H. Olmstead* on the brief and orally), for the defendant.

NADEAU, J. The plaintiff, New Canaan Bank & Trust (bank), appeals the Superior Court's (*Fitzgerald,* J.) ruling that the bank's bad faith conduct precluded it from recovering the balance due on a promissory note from the defendant, Steven S. Pfeffer. The bank challenges the ruling upon various grounds. Pfeffer cross-appeals, primarily arguing that the trial court erred in rejecting his equitable estoppel defense. We affirm the trial court's ruling against the bank based upon the estoppel issue raised in the cross-appeal, and thus do not address the bank's appeal or Pfeffer's other claims.

The following facts either were found by the trial court or are otherwise undisputed. On May 10, 1988, Pfeffer and John W. Madigan, III signed a $75,000 promissory note in favor of the bank. The note required payment on demand and provided for joint and several liability of Pfeffer and Madigan as co-debtors. The loan provided operating capital to Madigan & Pfeffer, a Connecticut law firm, and was secured by a blanket assignment of accounts receivable, inventory, machinery, equipment, furniture and fixtures.

In early 1991, the law partnership dissolved, and, by agreement, Madigan retained the office equipment, furniture, fixtures and accounts receivable. The dissolution triggered default on the note. In March 1991, the bank issued a demand letter to both Madigan and Pfeffer for full payment of the note plus interest. Pfeffer, who was in the process of moving to New Hampshire, asked his father to negotiate a repayment plan with the bank. He believed that his father, a former founding director of the bank, was in the best position to obtain a favorable resolution with the bank.

In late summer 1991, the elder Pfeffer met with bank president Thomas Lynn and requested that the bank discharge his son on the note in exchange for immediate one-half payment of the balance due. Lynn declined to release the son, but assured the elder Pfeffer that the bank would do its best to secure the remainder of the balance from Madigan alone if Pfeffer paid down the note.

Relying upon Lynn's statements to his father, Pfeffer delivered a check on October 8, 1991, for one-half the balance due on the note. Lynn declined Pfeffer's renewed request for a discharge, but told him that the bank would focus all of its collection efforts upon Madigan and that he had nothing to worry about. Lynn had known Pfeffer and his father for some time, as both Pfeffers had formerly served as directors and officers of the bank. He also was aware that Pfeffer had a difficult relationship with

Madigan, and that Pfeffer was trying to conclude his affairs in Connecticut before moving to New Hampshire.

Despite an agreement between Madigan and Pfeffer for each to pay one-half on the note by October 15, 1991, Madigan failed to pay the remaining balance. In March 1992, the bank sent second demand letters to both Madigan and Pfeffer. Pfeffer immediately phoned Gregory Kelsey, the vice president of the bank who authored the demand letter, and informed him of his agreement with Lynn. Kelsey told Pfeffer that while the bank had not discharged him from liability on the note, the bank "would definitely not let up on John Madigan." Pfeffer did not hear anything further from the bank until two and one-half years later.

In the interim, the bank failed to assert its right to collect the remaining balance from Madigan. Instead, the bank entered into an agreement, of which Pfeffer was unaware, to forbear from seeking the note balance from Madigan as long as he made interest payments. From late winter or early spring 1992 until May 1994, Madigan made sporadic interest payments to the bank. He told the bank on at least three different occasions that he had made, or was making, arrangements to pay off the remaining balance pending the closure of various business deals. No such funds materialized. Without alerting Pfeffer, the bank continued to forbear from seeking full payment from Madigan or securing any collateral from him, even though, as the trial court found, "[t]hroughout this time period, . . . Madigan had assets sufficient to satisfy some, if not all, of the outstanding balance." The bank never informed Pfeffer of the loan status even though he was still named as an obligor on the note.

During 1994, Madigan's financial condition deteriorated. His interest payments became more sporadic, and he failed to respond to the bank's written communications. At some point, he ceased making interest payments, and in August 1994 the bank issued a third demand letter solely to Madigan. In September 1994, Madigan finally responded to the bank, informing it that he had filed for personal bankruptcy. While he told the bank that the promissory note was not included on his list of debts and thus would still be subject to repayment, his assurances later proved untrue. Madigan also told the bank that he was anticipating profits from yet another business venture that would enable him to pay off the note, and the bank again indicated its willingness to forbear from collection if he paid all interest then owing. When Madigan made no further payments on the note, the bank turned its collection efforts to Pfeffer.

In October 1994, Pfeffer received a letter demanding full payment on the note, his first contact from the bank since March 1992. When he refused to pay the note balance, the bank filed suit against him. He asserted novation and estoppel, among others, as defenses.

After a trial on the merits, the trial court entered judgment against the bank, reasoning that the bank exercised bad faith in handling the loan and in its collection efforts against Madigan. The court rejected Pfeffer's equitable estoppel defense, however, ruling that:

> Pfeffer's equitable estoppel defense is ... unavailing. Pfeffer's reliance on the representations of [the bank] as a release of his liability under the note was patently unreasonable. [The bank], through Lynn and Kelsey, three times informed Pfeffer he would remain liable on the note. Even if the statements of Lynn and Kelsey were treated as false representations of [the bank]'s intent to release him, Pfeffer failed to make any effort to ascertain the truth of those statements. Pfeffer's lack of diligence in this respect precludes him from invoking equity to avoid his responsibilities under the note.

The parties filed post-trial memoranda at the court's request, and the court subsequently reaffirmed its initial order. The bank appealed, and Pfeffer cross-appealed.

Pfeffer asserts that the trial court erred in rejecting his equitable estoppel claim because the court mischaracterized the basis of his defense. He claims that he did not rely upon Lynn's statements as a *release* from liability under the note, but rather relied upon Lynn's representations that the bank would use its *best efforts* to collect the remaining balance from Madigan. The bank contends that Pfeffer misunderstands the court's ruling. We disagree with the bank, and therefore turn to the question whether the trial court properly characterized Pfeffer's estoppel defense.

■ In his pretrial pleading outlining his defenses, Pfeffer asserted that he made the October 1991 payment in reliance upon the bank's promise "to use its best efforts to seek repayment of the remaining debt from co-maker Madigan." He did not claim that the bank provided him a *release* from or discharge of his liability under the note. Further, taken in its entirety, Pfeffer's testimony demonstrates that his defense was based upon the bank's failure to diligently pursue Madigan for the remaining balance before turning its collection efforts to him, and not upon a formal discharge of liability.

Finally, in its order on the merits, the trial court found that "Pfeffer, *by his own testimony*, admits that neither Lynn nor Kelsey expressed any intention to release him from liability under the note, or that the bank had or would accept substitute performance, from a third party, of Pfeffer's duty to tender payment on the note." We conclude therefore, as a matter

of law, that the trial court erroneously rejected the estoppel defense as based upon a release or discharge of Pfeffer from future liability. We therefore turn to address the merits of his "best efforts" equitable estoppel defense.

The parties disagree as to whether New Hampshire or Connecticut law applies. We accept, for the purposes of this decision, the bank's contention that New Hampshire law applies. Because we conclude that the bank is precluded from recovering the note balance under New Hampshire law, we need not decide Pfeffer's contention that Connecticut law governs.

██ In New Hampshire, "[e]quitable estoppel serves to forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon." *Town of Seabrook v. Vachon Management*, 144 N.H. 660, 666 (2000) (quotation omitted). A party claiming equitable estoppel must prove the following:

> first, a representation or concealment of material facts made with knowledge of those facts; second, the party to whom the representation was made must have been ignorant of the truth of the matter; third, the representation must have intentionally, or through culpable negligence, induced the other party to rely upon it; and fourth, the other party must have been induced to rely upon the representation to his or her injury.

*Appeal of Kulacz*, 145 N.H. 113, 116 (2000) (quotation omitted).

██ While due diligence is not expressly delineated in the formal elements of equitable estoppel, the concept is incorporated into the requirement that a party asserting estoppel must establish *reasonable* reliance upon the opposing party's representation or concealment. In New Hampshire,

> [t]he reliance by the party bringing the estoppel claim on the representation or concealment must have been reasonable. Reliance is unreasonable when the party asserting estoppel, at the time of his or her reliance or at the time of the representation or concealment, knew or should have known that the conduct or representation or concealment was either improper, materially incorrect or misleading.

*Healey v. Town of Durham*, 140 N.H. 232, 240 (1995) (quotation omitted); *see also Conway Bank v. Pease*, 76 N.H. 319, 324-25 (1912) (party must have used due diligence to acquire knowledge of truth of statements relied upon); *Manning v. Cogan*, 49 N.H. 331, 340 (1870) (same).

■ Generally, we uphold the trial court's denial of an estoppel claim "unless it is unsupported by the evidence or erroneous as a matter of law." *Healey*, 140 N.H. at 240. In this case, however, where the trial court based its denial upon an erroneous characterization of Pfeffer's estoppel defense, we treat the matter as if the trial court made no findings on the estoppel issue and resolve the matter in favor of Pfeffer only if a reasonable finder of fact could not find differently as a matter of law. *See Town of Seabrook*, 144 N.H. at 666. With this standard in mind, we apply the elements of equitable estoppel to the factual findings determined by the trial court.

■ The trial court's factual findings conclusively establish the first estoppel element, that the bank made a representation or concealment of material facts with knowledge of those facts. The court found that the elder Pfeffer approached Lynn, the bank president, seeking a discharge of his son's liability for the entire balance due under the note in exchange for his son's immediate payment of one-half due. Lynn declined to discharge Pfeffer but, as found by the trial court, "agree[d] that [the bank] would do its best to seek the remainder balance from Madigan alone, if Steven Pfeffer tendered payment as the elder Pfeffer had suggested." The trial court found that when Pfeffer hand-delivered his check representing one-half of the note balance, Lynn again declined to discharge Pfeffer but stated that the bank "would focus all its collection efforts on Madigan, and that Pfeffer had nothing to worry about."

While the bank disputes the trial court's finding that the bank repeatedly made representations to diligently and exclusively pursue Madigan for the balance due in exchange for Pfeffer's October 1991 payment, the evidence amply supports this finding. Considering the bank's right under the note to seek *full* payment from *either* Madigan or Pfeffer, of which its knowledge is beyond dispute, Lynn's statements constitute representations that the bank would curtail this right by diligently pursuing Madigan for the remaining balance *before* seeking any further payment from Pfeffer.

The trial court also found that "Lynn was being dishonest when he represented that the bank would look exclusively to . . . Madigan for the remainder balance." It relied upon circumstantial evidence that the bank failed to pursue Madigan immediately following Lynn's representations and for a period of more than three years thereafter. It also relied upon

evidence that in April 1992, Lynn instructed a bank employee to "call on Steven Pfeffer's guarantee" just seven months after his representations to Pfeffer and his father and at a time when Madigan had not yet filed for bankruptcy. The trial court's factual findings, therefore, establish conclusively that the bank made representations of material fact with knowledge of those facts.

■ Turning to the second estoppel element, we conclude that the trial court's factual findings also establish conclusively that Pfeffer was ignorant of the truth of the matter. Without informing Pfeffer, the bank decided to forbear from collecting the remaining balance from Madigan provided he made current interest payments. This interest-only agreement began shortly after the bank agreed to diligently pursue Madigan for the remaining balance once Pfeffer made his October 1991 payment, and it continued until Madigan declared bankruptcy in 1994. While the bank issued a second demand to both Madigan and Pfeffer in March 1992, it again assured Pfeffer that it would not relax its collection efforts against Madigan. In August 1994, the bank issued a third demand solely to Madigan. The bank, however, failed to enforce any of its demands against Madigan or inform Pfeffer of its lapse. Furthermore, as found by the trial court:

> With the exception of the March 13, 1992 demand letters sent by Kelsey to both Madigan and Pfeffer, [the bank] made no effort to secure readily available collateral, or to establish a schedule for paying down the principal until just before Madigan filed for bankruptcy.

We acknowledge that it may not have been improper for the bank to have initially granted Madigan some leeway to repay the balance remaining after Pfeffer's October 1991 payment. It was patently unreasonable, however, for the bank to have made no collection effort beyond sending demand letters in 1992 and 1994 that apparently were nullified when the bank resumed accepting interest-only payments. Further, the bank never informed Pfeffer of the loan's status or its decision to accept interest-only payments. Accordingly, we conclude that the trial court's factual findings lead to the single conclusion that Pfeffer was unaware that the bank did not intend to diligently pursue collection from Madigan, contrary to what was represented to him in October 1991 and March 1992.

The bank disputes the trial court's finding that it agreed to forebear from collecting the remaining balance from Madigan provided he maintained current interest payments. Although the bank's senior lending

officer testified that no such agreement occurred, other testimony provided by the same witness, in addition to several bank documents submitted into evidence, supports the trial court's finding.

■ We turn to the third element, that the bank's representation must have been made with the intention of inducing Pfeffer to rely upon it. As found by the trial court, when Pfeffer's father approached Lynn to negotiate a repayment plan, Lynn agreed that the bank would exert its best efforts to secure the remainder from Madigan alone provided Pfeffer made an immediate payment of one-half of the balance. The trial court further found that Pfeffer delivered a check for one-half the balance "relying upon Lynn's representations to his father." At the time of delivery, Lynn represented that the bank would focus all of its collection efforts on Madigan for the remainder, knowing that Pfeffer had a difficult relationship with Madigan and that Pfeffer was trying to conclude his affairs in Connecticut before moving to New Hampshire. With Lynn's assurances, Pfeffer made payment and relocated his residence. Therefore, the trial court's factual findings establish conclusively that the bank's representations were made with the intent to acquire from Pfeffer an immediate payment of one-half of the note.

■ With respect to the fourth element, we conclude that the trial court's factual findings establish conclusively that Pfeffer was induced to rely upon Lynn's representations to his injury. The trial court expressly found that Pfeffer made payment in October 1991 in reliance upon Lynn's representations to pursue Madigan for the remaining balance. This finding is supported by the evidence.

The trial court's findings also demonstrate that Pfeffer was injured by the bank's representations and subsequent conduct. As found by the trial court, the bank's several assurances to Pfeffer that it would diligently pursue collection from Madigan alone "caused Mr. Pfeffer to relax his vigilance with regard to pursuing contribution from Mr. Madigan," and the bank's "inordinate delay in seeking full payment from Madigan resulted in the foreclosure of Pfeffer's ability to obtain contribution from Madigan." We conclude, therefore, that the trial court's findings establish conclusively that Pfeffer was induced to rely upon Lynn's representations to his injury.

The bank disputes the trial court's finding that it failed to make sufficient effort to collect the balance of the note from Madigan, asserting that Madigan had insufficient assets from which the bank could satisfy the remaining debt. While Madigan testified to his depleted financial status in his deposition, a trial exhibit, the bank acknowledges that "despite request,

Madigan produced *no* financial records whatsoever at his deposition." Sufficient evidence on the record offered through the elder Pfeffer and his son supports the trial court's finding that Madigan had adequate assets to satisfy the full balance due after Pfeffer's October 1991 payment.

The bank also argues that the trial court erred in concluding that its inaction prejudiced Pfeffer's right to obtain contribution from Madigan. It contends that "Pfeffer was never *'foreclosed'* of his right to contribution," summarily asserting that Pfeffer had a "continuing right of contribution" against Madigan under "Uniform Commercial Code Article 3-116." *See* RSA 382-A:3-116 (1994). The bank's reliance upon RSA 382-A:3-116 is questionable, however, given that this provision did not take effect until January 1, 1994, more than five years after the parties executed the promissory note at issue. The bank's argument also fails to take into account the impact of Madigan's bankruptcy upon Pfeffer's right of contribution. *See State v. Laurent*, 144 N.H. 517, 521 (1999).

■ Finally, we consider whether Pfeffer acted diligently to ascertain the truth of, and thus reasonably relied upon, the bank's assurances to diligently pursue Madigan for the remaining balance due after Pfeffer's October 1991 payment. We are not bound by the trial court's conclusion that Pfeffer lacked diligence in attempting to ascertain the truth of the bank's representations because it was based upon the court's mischaracterization of the estoppel defense.

Under the circumstances of this case, we have no doubt that Pfeffer, as a matter of law, exercised due diligence, and thus reasonably relied upon the bank's assurances. No facts found by the trial court suggest that Pfeffer had any reason to doubt the sincerity of Lynn's assurances to use the bank's best efforts to collect the note balance from Madigan. When Pfeffer received the March 1992 demand letter, he immediately phoned the bank, and was told by Kelsey that while he remained liable under the note, the bank would continue to pursue Madigan for the remaining balance. There is no evidence that Kelsey informed Pfeffer that the bank had accepted interest-only payments from Madigan and had abstained from collecting the balance from him.

In the years that followed, the bank gave no indication to Pfeffer that the note remained delinquent. In fact, the bank did not contact Pfeffer again until October 1994, after Madigan told the bank that he had filed for bankruptcy. Because the bank never pursued any other collection efforts against Pfeffer pursuant to the March 1992 demand, it was reasonable for him to have assumed that the bank had resolved the loan delinquency with Madigan.

If the bank had alerted Pfeffer within a reasonable time of its interest-only agreement with Madigan or of Madigan's failed promises to repay the loan in full, Pfeffer might have had some obligation to check periodically upon the status of the loan or take some other precautionary action to secure his right of contribution. Under the circumstances as found by the trial court, however, we conclude that Pfeffer acted with appropriate diligence by immediately responding to the bank's March 1992 demand letter. Therefore, the trial court's factual findings establish conclusively that Pfeffer's reliance upon the bank's representations was reasonable.

*Affirmed.*

BROCK, C.J., and BRODERICK, J., sat for oral argument but did not take part in the final vote; DALIANIS and DUGGAN, JJ., concurred.